# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | Adversary Proceeding |
| DAVID ASHTON MCLAIN | ) | |
| SHARON PATRICIA MCLAIN | ) | Number 06-4047 |
| (Chapter 7 Case Number 05-43382) | ) | |
| | ) | |
| *Debtors* | ) | |
| | ) | |
| ADAM GNALL | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID ASHTON MCLAIN | ) | |
| SHARON PATRICIA MCLAIN | ) | |
| | ) | |
| *Defendants* | ) | |

FILED at 1 O'clock & 48 min P.M. Date April 3, 2007
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia

## **MEMORANDUM AND ORDER**

The Debtors rented a house from the Plaintiff from April 2001 until late July 2005. They filed their Chapter 7 case on December 13, 2005. The Plaintiff alleges that the condition of his house after the Debtors vacated the premises was horrendous and uninhabitable. Alleging that the Debtors did significant damage to the house, the Plaintiff contends that the net cost to fix the house and make it habitable again was $13,574.00. Due to the nature and extent of the damage to his house, the Plaintiff initiated this adversary

proceeding against the Debtors seeking to determine the dischargeability of the repair costs he incurred pursuant to 11 U.S.C. § 523(a)(6).[1] *See* Dckt. No. 1 (May 15, 2006). A trial on this matter was held on January 17, 2007. After taking the matter under advisement, the Court received letter briefs from both parties. Upon the evidence and legal arguments presented by both sides, I make the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FINDINGS OF FACT

The Plaintiff owned a house at 111 East White Hawthorne Drive, Savannah, Georgia. He originally entered into a residential lease agreement with the Debtors to lease the home to them from April 1, 2001, until March 31, 2002. *See* Dckt. No. 11, Plaintiff's Exhibit 1 (January 17, 2007). The parties subsequently agreed to extend the one-year lease term three more times. The Debtors have five children, with ages ranging from one and a half to sixteen years old. The Plaintiff permitted the Debtors to bring their golden retriever dog with them into the house but on the condition that should the dog die during the lease, no other pets would be permitted on the premises. At one point during their stay, the Debtors took in a stray pregnant dog into the house for two to three months and released the puppies soon after they were born.

In June 2005, the Plaintiff received a handwritten letter from the Debtors

---

[1] Hereinafter, all Section references are to Title 11 of the United States Code.

indicating that they would leave the house in July 2005. The Debtors eventually left the house during the first week of August. It was at that time that the Plaintiff entered and inspected the house. The Plaintiff testified that the condition of the house upon his initial inspection was "horrendous." The house was unlocked, and an automobile had been abandoned out front. Trash was scattered around the property, and a large sofa and chair had been left on the patio. The Plaintiff eventually contacted Ryan Gossett to inspect and repair the house. The estimate for Gossett's work was $11,740.00. Due to repairs made for termite damage, however, the actual amount of the repair reached $14,653.00, which the Plaintiff attributes to the Debtors' failure to heed his instruction to spray for termites during the lease term. After applying various credits and security deposits, the Plaintiff expended a net amount of $13,574.00 on repairs.

Gossett testified about the condition of the house and what he had to do to make it habitable again. During his testimony, Gossett referred the Court to Plaintiff's Exhibit 5, which is a collection of photographs of the house after the Debtors' left. I will now describe what those photographs depicted.

On its exterior, the house had suffered damage to its cedar siding, especially around the base of the house, in part caused by the Debtors' dog. The gutters along the edge of the roof were full of dirt and plants, and the down spouts from the gutters had been removed. The box cover for the cable television outlet had been removed. The Debtors abandoned a couch and easy chair on the patio. There was a shed in the house's backyard,

which the Debtors had left garbage in.

In the living room, stains marked the carpet and walls, most likely from food, liquids, and the Debtors' dog. These carpet stains were pervasive throughout the house. Walls in the living room had been marked with some type of black magic marker. A blade on the ceiling fan in the living room had been broken off, and there was incomplete painting at the base of the fan. Gossett testified that upon entering the living room for the first time, 30 to 40 fleas jumped onto his legs and that it took pest control nearly a week to resolve this problem. The living room contained a screen door to the patio in the back of the house. Scratch marks were on the screen door, apparently from the Debtors' dog. Furthermore, the frame of the screen door had been bent out of place, most likely the result of forced entry through the use of a crowbar.

In the kitchen, electrical controls and knobs had been forcibly removed from the vent covering the stove. A cabinet door underneath the sink had been forcibly removed. Gossett testified that it appeared as though someone attempted to reattach the cabinet door with an epoxy adhesive. There was damage to a center-divide in one of the kitchen drawers. Also, the kitchen floor had sustained water damage in the area surrounding the dishwasher.

Attached to the kitchen was a pantry area. The upper cabinets in the pantry had sustained damage as they were falling from the wall, but Gossett was not sure how they had been pulled down. The walls had stains and damage as well, apparently caused by the

4

Debtors' dog. The frame of the door leading into the pantry had sustained damage.

The house's garage had been converted into a bonus room. There were small holes on one wall in this room. Like the living room, the ceiling of this room had only been partially painted. The electrical outlets in this room had been painted, as had most of the electrical outlets throughout the rest of the house. According to Gossett, having paint on electrical outlets is a violation of the electrical code. The ceiling of the bonus room had sustained damage from a leaking evaporator unit. In addition, it appears that toilet paper had been stuffed into holes in the ceilings.

In the first bedroom, the door jamb had been split and broken. The door stop had been removed on the opposing wall, which resulted in damage to the wall from the door knob. The strike plate had been removed from the doorframe. Gossett testified that the dark blue paint in the room had been incorrectly applied, most likely by an amateur painter. On several parts of the walls, someone had applied fluorescent caulk in the shape of a hand. The subsequent removal of the caulk resulted in damage to the drywall. In addition, the light fixture on the ceiling lacked a cover plate, and its insulation had been incorrectly installed. Someone or something had damaged the ceiling (possibly from above in the attic), and the wrong type of drywall had been used to fix that damage. The walls of the bedroom closet were marked by holes and paint stains. The window blinds had been damaged as well.

In the bathroom in the main hallway, the tiles on the floor had sustained

water damage, apparently from an improperly sealed toilet. The water damage extended to the baseboards around the bathroom floor. The toilet had been incorrectly installed, and its bowl had sustained "spider-web" cracks. In addition, the vanity sink had been broken loose from the counter. Holes had been made in the drywall, including a larger hole near the towel rack. In the laundry room, a hole had been made right below the washer. In addition, the floor tile had been incorrectly and incompletely installed.

In the second bedroom, florescent caulk had been applied to the walls in the shape of human faces. As in the first bedroom, removal of this caulk resulted in damage to the bedroom walls. The door jamb had been splintered from the top to the bottom, and the strike plate had been removed from the door frame. The door stop against the wall had been removed, which allowed a hole to punched be through the wall from the door knob. The carpet around the door had been pulled up and damaged by the Debtors' dog. The window sill in the bedroom had sustained water damage. Like the other rooms in the house, the painting of the ceiling had not been properly completed. In addition, hundreds of staples, pins, and thumbtacks had been left on the walls. Gossett testified that the removal of this material made repair of the walls difficult. Like the ceiling fan in the living room, a blade on the ceiling fan in this room had also been broken off.

In the master bathroom, the door jamb had been damaged as well as the baseboards near the door. The vinyl on the floor had sustained water damage, possibly from the toilet. Gossett testified that he had to physically remove a rock, foil, and toothbrush that

had been forcibly stuffed into the toilet. Gossett suspects that this stoppage, along with the fact that the toilet had been incorrectly installed, allowed additional water to leak and damage the bathroom floor. In addition, the evaporator on the ceiling had been leaking, which caused damage to the bathroom ceiling.

The Debtors testified at trial as well. Mr. McLain testified that he made several repairs to the house at his own expense. For example, when the toilet in the hallway bathroom suffered a blockage, the Debtors called Roto-Rooter to fix the problem. He admitted that he and his wife were unaware of some of the things that his children were doing to the house. Mr. McLain stated that his job as a chef was very time-demanding and that his wife's sickness prevented her from taking a more active role in caring for the house and monitoring their children. Indeed, Mrs. McLain admitted that their children were frequently left unattended in the house for a few hours at a time. The Debtors testified that they had no reason or motive to intentionally hurt the Plaintiff by damaging his house.

## CONCLUSIONS OF LAW

Under Section 523(a), an individual debtor may be denied a discharge under Section 727 for any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The seminal case establishing the proper standard for determining a willful and malicious injury under Section 523(a)(6) is the United States Supreme Court's decision in Kawaauhau v. Geiger, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Under Geiger, "nondischargeability takes a deliberate or intentional

injury, not merely a deliberate or intentional act that leads to injury." 523 U.S. at 61. Furthermore, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of [Section 523(a)(6)]." Id. at 64.

Previously, my interpretations of Geiger have led me to conclude that it "is clear that engaging in a voluntary act with the desire to cause harm or the knowledge that injury will occur to a targeted person is sufficiently willful and malicious." Henderson v. Woolley (In re Woolley), 288 B.R. 294, 301 (Bankr. S.D. Ga. 2001)(citing Johnson v. Fors (In re Fors), 259 B.R. 131, 136 (8th Cir. B.A.P. 2001))(quotations omitted). Furthermore, "a debtor's belief that harm is substantially certain to occur to a targeted person as a result of the voluntary act is also sufficient." In re Woolley, 288 B.R. at 302 (citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir. 1999)). Finally, where no other plausible inference may be drawn than that a debtor had knowledge with substantial certainty that harm would result, "then the debtor's requisite knowledge that harm will result can and should be inferred." In re Woolley, 288 B.R. at 302 (citations omitted).

In the context of landlords seeking determinations of nondischargeability for damages incurred during the tenancy of a debtor, different bankruptcy courts have rendered judgments in different ways. For example, in Keeter v. Naranjo (In re Naranjo), 349 B.R. 304 (Bankr. M.D. Fla. 2006), a Chapter 7 debtor allegedly caused damage to the plaintiff's residential property, including holes in the walls, damage to the central heat and air due to the debtor's failure to replace the air filter, removal of the front storm door,

removal of the new polyurethane from the hardwood floor, and removal of light fixtures. Id. at 306. Despite this damage, the court concluded that the plaintiff had not met Geiger's standard of willful and malicious intent. Id. In Lilledahl v. Kibbee (In re Kibbee), 287 B.R. 239 (Bankr. E.D. Mo. 2002), the court denied a request of nondischargeability under Section 523(a)(6) as the plaintiff failed to establish that the debtors intended to cause the household damage, which included stains on the rugs, removal of heating duct covers, trash throughout the house, damage to plaster on the walls, missing knobs on the kitchen cabinets, and missing light fixtures.

However, in Spencer v. Hatton (In re Hatton), 204 B.R. 470 (Bankr. E.D. Va. 1996), the court found that a state court judgment arising from the costs and fees incurred in repairing the damage caused by the debtors to the plaintiff's house was nondischargeable under Section 523(a)(6). The court made this conclusion after noting that the "squalor that the [debtors] created and chose to live in is shocking to one's sense of civility, and it evidences willful conduct on the part of the [debtors]." Id. at 474. The court in O'Brien v. Sintobin (In re Sintobin), 253 B.R. 826 (Bankr. N.D. Ohio 2000) reached a similar conclusion. In that case, the plaintiff had secured a state court judgment against the debtors to compensate him for damages to the property incurred while the debtors leased his house. The damages included spray painted walls, destroyed cupboards, dirty carpeting, ripped up linoleum, garbage in the house, holes in walls, and broken doors. Id. at 829. The court found that the state court judgment was nondischargeable under Section 523(a)(6) after concluding that the debtors' apathy towards and failure to prevent the destructive actions of their

9

children and their children's friends intentionally caused the damage to the plaintiff's house. Id. at 831.

In the present case, under their original residential lease agreement with the Plaintiff, the Debtors agreed to certain duties pertaining to the condition of the Plaintiff's house. See Dckt. No. 11, Plaintiff's Exhibit 1 (January 17, 2007). Upon vacating the premises, the Debtors agreed to clean the tile and concrete floors, vacuum the carpet, clean the driveway and patios, and close and lock all windows and outside doors. Id., ¶ 8. They agreed to replace all damaged or missing doors and window panes and screens both during and at the end of the tenancy. Id., ¶ 9. They agreed to maintain the property in good condition and repair, natural wear and tear excepted. Id., ¶ 14. This duty also included the responsibility to make no alterations to the property without prior written consent from the Plaintiff, to change the filters in the heating and air conditioning equipment once a month, and to provide for pest control. Id. The Debtors agreed to pay all costs for damage to the property caused by them, their family members, pets, and guests. Id., ¶ 18. Finally, among the special stipulations in the agreement, the parties agreed that no additional pets would be allowed at the house on a full-time basis without the Plaintiff's consent and that the Debtors would be responsible for maintaining and repairing the appliances in the house. Id., ¶ 30.

As recounted in the Findings of Fact, the testimony and pictures presented at trial clearly demonstrate that the Debtors violated their duties under their residential agreement with the Plaintiff. In a word, the damage to the Plaintiff's house was

overwhelming. From the testimony, it is apparent that not a single room in the Plaintiff's house was spared some form of damage or injury during the Debtors' tenancy. Taken as whole, the extensive nature of the damage that occurred during the Debtors' tenancy is sufficient to trigger liability under Section 523(a)(6). Indeed, the scope of damage throughout the house leads to the plausible and reasonable inference that the Debtors did most of the damage, were aware of the rest as it occurred, and that their failure to act or take remedial measures was substantially certain to cause injury to the Plaintiff's house.

This conclusion is supported by the multiple and recurring damages throughout the house. For example, the carpets and walls throughout the house had extensive stains that were, as described by Gossett, most likely from food, liquids, or the Debtors' dog. The walls in the living room had been marked with a black magic marker, whereas the closet in the first bedroom had been marked with paint stains. Holes had been made in the walls of the bonus room, the first bedroom's closet, the hallway bathroom, and the laundry room. Someone in the house had forcibly removed the electrical controls over the stove; bent the patio door frame out of place; removed the cabinet door underneath the sink; and installed staples, pins, and thumbtacks on the walls of the second bedroom. Blades on the ceiling fans in both the living room and the second bathroom had been broken off. In addition, there was water damage on the floors in the hallway and master bathrooms as well as in the kitchen. The toilets in both bathrooms suffered extensive damage and had been incorrectly installed.

While the Debtors attempted to repair some of the damage to the Plaintiff's

house, these limited actions are insufficient to prevent liability from attaching under Section 523(a)(6). It is clear that during the Debtors' tenancy, the amount and scope of damage to the house was such that reasonable individuals would have been more proactive in mitigating the damage. This conclusion is further supported by the manner in which the Debtors handled the damage caused to the house by their children. Although the Debtors admit that their children caused some of the damage to the house, they contend that they did not condone or sanction their children's destructive activities. This defense rings hollow, however, in light of Mrs. McLain's testimony that the children were left unattended for several hours everyday. During their tenancy, the eldest child was between 12 and 16 years old. This damage could not have occurred except over a protracted time frame, during which it would have been apparent to any reasonable person. To allow the damage to metastasize throughout the house shifts the Debtors' course of conduct from one of isolated negligence or recklessness into a continuing failure to act contrary to the lease obligations, an omission substantially certain to cause harm to the Plaintiff.

While standing idly by as isolated incidents of damage occurred would not in the ordinary case trigger a finding of willful and malicious injury, this damage is so pervasive and extensive, and due to the type of injury that occurred here, I find that even if all that can be shown is a failure to act, a willful and malicious injury occurred. Although no one can reconstruct who committed each individual act of vandalism or neglect, the Debtors are responsible. If they damaged an item, it is their responsibility. As tenants, they had affirmative duties to the Plaintiff as their landlord that negate any notion that they could

sit on the sidelines as their children, pets, or anyone else trashed this house. *See, e.g.*, Dckt. No. 11, Plaintiff's Exhibit 1, ¶ 14 (January 17, 2007)("Tenant agrees to maintain the property in good condition and repair, natural wear and tear excepted."). In Georgia, although the parent-child relationship alone is not enough to render parents liable for the damages caused by the torts of their children, they may still be liable for their children's actions under the ordinary principles of liability.[2] Corley v. Lewless, 227 Ga. 745, 748, 182 S.E.2d 766 (1971). Once the first instance of intentional or negligent damage was observed, they had a heightened awareness of the risk to the premises and a duty to prevent it. By failing to do so, they knowingly permitted acts to be committed that were substantially certain to result in injury.

This conclusion is difficult to articulate or to distinguish from cases where damage to premises would not rise to the Section 523(a)(6) standard. The parties, or anyone relying on this decision for precedent, should be mindful of the saying that "a picture is worth a thousand words." The physical evidence, preserved in numerous photographs, demonstrates far more clearly than the written word why the Court reaches its conclusion. There is a continuum of damage evident in the home from ordinary wear and tear (rotten wood along the roof) to wrongful modifications (unauthorized painting, caulking, and

---

[2] "[When] liability exists it is based on a principal-agent or a master-servant relationship where the negligence of the child is imputed to the parent, or it is based on the negligence of the parent in some factual situation such as allowing the child to have unsupervised control of a dangerous instrumentality . . . . [The] true test of parental negligence *vel non* is whether in the exercise of ordinary care he should have anticipated that harm would result from the unsupervised activities of the child and whether, if so, he exercised the proper degree of care to guard against this result." Hill v. Morrison, 160 Ga. App. 151, 151, 286 S.E.2d 467 (1981).

stapling) to quasi-vandalism (broken fans, cabinets, doors, screens, plumbing). The Debtors have no responsibility for ordinary wear and tear, and a few isolated examples of tenant damage would not meet the Section 523(a)(6) standard. The magnitude of the type of damages in this case, however, is simply overwhelming and leads inevitably to the conclusion that a willful and malicious injury has occurred.

## DAMAGES

The Plaintiff testified that his net costs to repair all the damages and defects in the house upon his reentry amounted to $13,574.00. Some of the repairs were due to normal wear and tear, especially on the exterior where the elements would gradually cause deterioration of any structure. Most of the damage, however, was interior and man-made. At the conclusion of the case, I left the record open for Gossett to submit a breakdown of the labor and material attributable to wear and tear as compared to intentional damages. *See* Dckt. No. 14 (January 31, 2007). That analysis was timely submitted, and I have carefully reviewed it.

Based upon Gossett's testimony and the breakdown he submitted, the Plaintiff contends that $11,853.00 of the labor and materials was attributable to the Debtors' abuse of the premises. *See* Id., Tab 2. With the exception of exterior work to clean and repair damage due to rot as well as gutter and down spout repairs, I find those items to be compensable and excepted from discharge. Because I estimate that the non-compensable portion of the Plaintiff's request to total $1,500.00, I hold that the Plaintiff's damages that

are excepted from discharge to be $10,353.00.

## **O R D E R**

Pursuant to the foregoing, IT IS THEREFORE ORDERED that the Debtors's obligation to pay $10,353.00 to the Plaintiff is excepted from discharge pursuant to Section 523(a)(6) due to their willful and malicious injuries to his house.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 3rd day of April, 2007.